# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| APPROXIMATELY 1.1222 BITCOIN FROM | : |
| ACCOUNT NO: XXXX0715 HELD IN THE | : |
| NAME OF XIN WANG AT OKX | : |
| CRYPTOCURRENCY EXCHANGE; | : |
|  | : |
| First-Named Defendant Property, | : |
|  | : |
| APPROXIMATELY 93,761.6466 TETHER | : |
| (USDT) FROM ACCOUNT NO: XXXX0715 | : |
| HELD IN THE NAME OF XIN WANG AT OKX | : |
| CRYPTOCURRENCY EXCHANGE; | : |
|  | : |
| Second-Named Defendant Property. | : |
|  | : |
|  | : |

CASE NO.:

## <u>VERIFIED COMPLAINT FOR FORFEITURE</u>

COMES NOW, Plaintiff, the United States of America, by and through its attorney,

the United States Attorney for the Middle District of Georgia, brings this complaint and

alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty

or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure:

### *Nature of the Action*

1.    This is a civil action *in rem* brought pursuant to Title 21, United States Code,

Section 881(a)(6) and Title 18, United States Code, Section 981(a)(1)(A) to forfeit and

condemn to the use and benefit of the United States of America certain personal property, to wit: approximately 1.1222 Bitcoin from Account No: XXXX0715 held in the name of Xin Wang at OKX Cryptocurrency Exchange; and approximately 93,761.6466 Tether (USDT) from Account No: XXXX0715 held in the name of Xin Wang at OKX Cryptocurrency Exchange (hereinafter collectively referred to as the "Defendant Property").

### The Defendants in Rem

2.     The First-Named Defendant Property consists of the following digital currency that was seized by the Federal Bureau of Investigation, pursuant to a Federal seizure, on or about April 15, 2024, and received from OKX on or about June 9, 2024: approximately 1.1222 Bitcoin from Account No: XXXX0715 held in the name of Xin Wang at OKX Cryptocurrency Exchange, Aux Cayes FinTech Co. Ltd., Suite 202, 2nd Floor, Eden Plaza Victoria, Mahe, Seychelles.  The First-Named Defendant Property is presently in the custody of the Federal Bureau of Investigation in a government controlled digital currency wallet.

3.     The Second-Named Defendant Property consists of the following digital currency that was seized by the Federal Bureau of Investigation, pursuant to a Federal seizure, on or about April 15, 2024, and received from OKX on or about June 9, 2024: approximately 93,761.6466 Tether (USDT) from Account No: XXXX0715 held in the name of Xin Wang at OKX Cryptocurrency Exchange, Aux Cayes FinTech Co. Ltd., Suite 202, 2nd Floor, Eden Plaza Victoria, Mahe, Seychelles.   The Second-Named Defendant

Property is presently in the custody of the Federal Bureau of Investigation in a government controlled digital currency wallet.

## Jurisdiction and Venue

4.     Plaintiff brings this action *in rem* in its own right to forfeit the Defendant Property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5.     This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this District, and 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the action accrued in this District. Upon the filing of this complaint, the Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the Plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this District, and 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the action accrued in this District.

## Basis For Forfeiture

7.     The Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of the Controlled

Substances Act; 2) proceeds traceable to such an exchange; and/or 3) money used or intended to be used to facilitate a violation of the Controlled Substances Act.

8.     The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), or is property traceable to such property.

### *Statutory and Regulatory Framework*

9.     Pursuant to Title 18, United States Code, Section 841(a)(1), it is unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

10.    Pursuant to Title 18, United States Code, Section 841(h), it is unlawful for any person to knowingly or intentionally (A) deliver, distribute, or dispense a controlled substance by means of the Internet, except as authorized under the chapter, or (B) aid or abet (as such terms are used in Section 2 of Title 18) any activity described in subparagraph (A) that is not authorized under the subchapter.

11.    Pursuant to Title 21, United States Code, Section 846, any person who attempts or conspires to commit any offense defined in Title 21 shall be subject to the same penalties as those prescribed for the offense(s), the commission of which was the object of the attempt or conspiracy.

12.    Pursuant to Title 18, United States Code, Section 1956(a)(2), it is unlawful for any person to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through

a place outside the United States or to a place in the United States from or through a place outside the United States (A) with the intent to promote the carrying on of specified unlawful activity; or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

13.    Title 21 United States Code, Section 881(a)(6) provides for the forfeiture of (A) all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical; (B) all proceeds traceable to such an exchange, and (C) all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Controlled Substances Act.

14.    Title 18, United States Code, Section 981(a)(1)(A) provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 or any property traceable to such property.

15.    Pursuant to Title 18, United States Code, Section 1956(c)(7)(B), the term "specified unlawful activity" includes violations of the Controlled Substances Act, more specifically, Title 21, United States Code, Sections 841(a)(1), 841(h), and 846.

16.    Pursuant to Title 18, United States Code, Section 1961(1)(B), as incorporated by Title 18, United States Code, Section 1956(c)(7)(A), the term "specified unlawful

activity" includes violations of Title 18 United States Code, Section 1956 (the laundering of monetary instruments).

### *Background on the Dark Web and Cryptocurrency*

17.     The "dark web" is a portion of the "Deep Web" of the Internet, where individuals must use an anonymizing software or application called a "darknet" to access content and websites. Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web"). These online market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. Famous dark web marketplaces, also called Hidden Services, such as Silk Road, AlphaBay, and Hansa (all of which have since been shut down by law enforcement), operated similarly to clear web commercial websites such as Amazon and eBay, but instead offered illicit goods and services.

18.     "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" on dark web marketplaces. Customers, meanwhile, operate "customer accounts." Vendor and customer accounts are not identified by numbers, but rather monikers or "handles," much like the username one would use on a clear web site. If a moniker on a particular marketplace has not already been registered by another user, vendors and customers can use the same moniker across multiple marketplaces, and based on seller and customer

reviews, can become well known as "trusted" vendors or customers. It is also possible for the same person to operate multiple customer accounts and multiple vendor accounts at the same time. For example, one person could have a vendor account that he or she uses to sell illegal goods on a dark web marketplace in exchange for cryptocurrency; that same vendor could also have a different customer account that he or she uses to exchange cryptocurrency earned from vendor sales for fiat currency.[1]  Because they are separate accounts, a person could use different accounts to send and receive the same cryptocurrency on the dark web. It is known that dark web vendors have multiple monikers for different vendor and customer accounts to prevent law enforcement from identifying which accounts belong to the same person, and who the actual person is that owns or uses the accounts.

19.    The "Tor network," or simply "Tor" (an abbreviation for "The Onion Router"), is a special network of computers on the Internet, distributed around the world, designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor also enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network. Such hidden services operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software, including a browser known as "Tor Browser," designed

---

[1] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

to access the Tor network. Examples of hidden services websites are the aforementioned AlphaBay and Hansa. Tor is available on cellphones using the Android and Apple operating systems by installing an application that puts a TOR-enabled internet browser on a user's cellphone, which then routes the phone's IP address through different servers all over the world, making it extremely difficult to track.

20.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[2] Cryptocurrency, itself, is not illegal in the United States.

---

[2] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

21.    Bitcoin ("BTC") is a type of cryptocurrency. Payments or transfers of value made with Bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire Bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" Bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. While it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

22.    Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to

a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case- sensitive string of letters and numbers, 26–35 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

23.    Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

24.    Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are

electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[3] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies are further secured, in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

25.    Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange Bitcoin for other currencies, including U.S. dollars. According to the US Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses. Such exchanges and exchangers are required to register with FinCEN and have proper

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.

state licenses (if required under applicable state law). Registered money transmitters are required by law to follow Bank Secrecy Act anti- money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency- for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

26.     Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the specific device on which the wallet application was

installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

*Background of the Investigation and Factual Allegations*

27.     In August 2023, an individual working as a confidential human source ("CHS") identified a subject of interest named Devito Young ("YOUNG"), as someone involved in the sale and distribution of illegal narcotics.  According to the CHS, YOUNG controls a large drug trafficking organization ("DTO") via connections he has made in and outside of prison. YOUNG is currently serving a prison sentence for aggravated assault, possession of firearm by convicted felon, possession with intent to distribute drugs (cocaine and methamphetamine), and trafficking methamphetamine. YOUNG possesses a contraband phone and uses associates, commonly referred to as "runners", to distribute narcotics. YOUNG acts as a broker involving illicit drug transactions throughout the United States and internationally.

28.     During previous dealings with the CHS, the CHS identified YOUNG through a former associate who put them in contact with each other. After several dealings, the former associate was cut out, and the CHS began working directly with YOUNG. According to the CHS' information, YOUNG was only known as "Big" because they never met in person. All communications between YOUNG and the CHS were on Telegram with YOUNG's username "Big". With limited information and knowing YOUNG was incarcerated, Agents requested information on YOUNG through the Georgia Department of Corrections ("GDC"). According to a GDC intelligence profile, "Big" is an alias for YOUNG, who is currently incarcerated in Macon State Prison, within the Middle District of Georgia. Furthermore, YOUNG verbally admitted to GDC Officers during the security group validation that he is a member of the Gangster Disciples.

29.     The Gangster Disciples are a nationwide criminal street gang with a Georgia chapter which extends its criminal enterprise by operating multiple sets, including one in Athens, Georgia. These sets typically operate somewhat independently; however, they will meet and discuss business as a Georgia group on occasion. Most of the individuals have extensive criminal histories and are suspected of involvement in various crimes, to include but not limited to armed robbery, aggravated assault, murder, fraud, and illegal drug sales.

30.     On June 22, 2023, Correctional Officers with Macon State Prison seized a cellular device found in K2 cell 214T on the bunk within YOUNG's cell. Officers were able to associate the cellular device with YOUNG being the primary user based on the location the device was found, conversations located within the device, and through user

14

accounts which displayed variations of YOUNG's first and last name to include "Vito" and "Big Vito". Through an extraction of the device by GDC Officers, YOUNG had two Google Gmail accounts connected to his Facebook account and one of the accounts connected to his Google Drive account. Google account yvito169@gmail.com and newmoneytrapp@gmail.com were associated with Facebook account Tru Trapp (ID: 100078138903517). Based on chat conversations extracted from the device, one chat conversation detailed the sale of drugs including "weed" and "bags of K2". K2 is a term commonly used to refer to a designer drug that mimics THC, the main psychoactive ingredient in marijuana. It is also commonly referred to as spice or synthetic marijuana. During the conversation, the contact self-identified as "Machine" and the user (YOUNG) provided the email address of yvito169@gmail.com. "Machine" advised he owed YOUNG $1,100.00, and YOUNG provided telephone number 404-353-3905 for a CashApp transaction. According to T-Mobile subscriber records, telephone number 404-353-3905 is subscribed to Trace WORKS at 460 Norton Circle SE, Smyrna, Georgia.

31.    Furthermore, in the same conversation, messages regarding payments for "…2 bags 2 cherry 1 lemon t blk runts" to which the contact responded, "I can get them tomorrow night and send them Thursday when I get my stuff back out of storage to ship it." The user, believed to be YOUNG, provided the following addresses, "JCB Lawncare" located at 4813 Ridge Road, Douglasville, Georgia 30134, "Trae Dubb" located at 575 Kennesaw Drive, Smyrna, Georgia 30080, and "Tra Dubb" located at 22 Peachtree Circle, Marietta, Georgia 30060 as potential delivery locations. Additional intelligence indicated the drugs were being shipped via the United States Postal Service when the contact

stated, "That's only 2 pounds sent. He is shipping 2, 2, 2 at 3 different post office he about to walk into the other post office".

32.    On or about September 9, 2023, Agents obtained a recorded conversation between YOUNG and the CHS, where YOUNG sent the CHS a screenshot of a conversation between YOUNG and an unknown individual by the username "EggRoll". Through the CHS' information, "Eggroll" is a Chinese K2 distributor, and YOUNG is coordinating with the distributor to receive K2 kits for $3,000.00 a kilogram. YOUNG advised "Eggroll" that once he receives five (5) kits, he would like to purchase ten (10) kits. Also captured in the screenshots between "Eggroll" and YOUNG, YOUNG provided several addresses to ship the drugs to include, "Tray Wokins" at 22 Peachtree Circle, Marietta, Georgia, "Duran Younger" at 1008 Augusta Drive SE, Marietta, Georgia, and "JCB Lawncare" at 4813 Ridge Road, Box 113, Douglasville, Georgia. Further detailed below, "Tray Wokins" is believed to be Trace WORKS, who Agents identified as one of YOUNG's runners. In addition, "Duran Younger", is believed to be Devito Duran YOUNG, the target of the captioned investigation.

33.    In some instances, other undercover agents successfully utilized separate undercover customer accounts on dark web marketplaces to conduct undercover drug buys from vendors believed to be the UC Vendor Account's customers.[4]

---

[4] Dark web vendors often use different account names for different purposes and transaction types, in order to maintain anonymity across transactions. For example, many of the UC's customers appear to use different customer account names for their Bitcoin exchanges with UC Vendor Account-1 than they use for the vendor accounts through which they sell their own illicit goods or services. In some instances, however, investigators have found evidence linking a UC Vendor Account-1 customer to a specific vendor account, and in a very small number of those cases, the same moniker was used for both the customer and vendor accounts.

34.     On October 27, 2023, Agents met with the CHS at a location within the Middle District of Georgia and purchased approximately 1,500 fentanyl pills from YOUNG for $6,353 using FBI funds. Per YOUNG's instruction, once the money is sent via Bitcoin ("BTC") to YOUNG's BTC wallet (3PDZYH84zLHjkJKayohG9n7B5yCwqpjJ8p), YOUNG will have his runner, later identified as Trace WORKS, take it to the post office and send it via United States Postal Service ("USPS"). YOUNG sent the CHS a Facebook Messenger screenshot with the BTC wallet to the CHS. Also captured in the Facebook Messenger screenshot was the user account "Topshelf Bullycamp". Coordinating with United States Postal Inspection Services ("USPIS"), Inspectors had the package containing narcotics sent to a covert Post Office Box located within the Middle District of Georgia. Later captured through a recorded conversation, YOUNG sent a video to the CHS of his runner photographing the package, which contained a photo of the fentanyl pills and shipping label with the address provided by the CHS.

35.     On October 31, 2023, Postal Inspectors received a USPS priority mail express parcel from the undercover Post Office Box. The contents in the parcel included approximately 101.9 grams of blue "M30" pills, which field tested positive for fentanyl. Based on the dangerousness of fentanyl exposure, the pills were not counted. Through postal business records, Postal Inspectors identified the package being shipped from a Post Office in Smyrna, Georgia where the mailer used a Capital One credit card (ending in 2328) to pay for the transaction. Records obtained from Capital One show the card belonged to a Trace WORKS. Agents also obtained video surveillance, in which the

mailer appeared to be the same person identified as Trace WORKS in a Georgia driver's license photo.

36.     On November 9, 2023, Agents received records pursuant to a subpoena issued to Meta Platforms, Inc. requesting subscriber records for "Topshelf Bullycamp". According to the records, the account is associated with Google email Topshelfbullycamp@gmail.com, telephone number 404-435-3905 (subscribed to WORKS), and a Capital One credit card (ending in 2328) with the name Trace WORKS. Open-source database checks indicate the telephone number 404-435-3905 is also associated with Trace WORKS.

37.     As part of the investigation, Agents obtained surveillance footage from the Post Office and observed the same male get into a white sedan. Agents also obtained records from Smyrna Police Department regarding an accident report on April 5, 2023. Records show WORKS was driving a white 2020 Kia Rio with Georgia registration CPT4278. According to Georgia Department of Driver Services, that vehicle is registered to a Joiah Mason of 5106 Crescent Cove Lane, Mableton, Georgia. Detailed below, Topshelfbullycamp@gmail.com is registered under an email account of joiahnmason@gmail.com. Based on surveillance footage, the vehicle seen at the post office has the same characteristics as a 2020 Kia Rio. Furthermore, Agents conducted several spot checks and observed the 2020 Kia Rio at the residence of 5106 Crescent Cove Lane.

38.     On November 15, 2023, Agents received records pursuant to an additional subpoena issued to Meta Platforms, Inc. requesting subscriber records for the account

located/linked in the contraband phone recovered by GDC Officers at Macon State Prison. The account labeled "Tru Trapp" was identified by Meta ID "100078138903517", which subscriber records show belonged to the name "Tru Trapp" with yvito169@gmail.com and newmoneytrapp@gmail.com listed as verified email addresses. The telephone number associated with the Facebook account was 470-999-1982. Login and log-out records show YOUNG's Facebook account was accessed over thirty (30) times between November 1, 2023, and November 15, 2023. IP addresses linked to YOUNG's Facebook account show the account being accessed through a Wireless Application Protocol ("WAP"), which is a web browser for mobile devices such as mobile phones that use the protocol.

39.    On December 11, 2023, Agents met with the CHS within the Middle District of Georgia for the purpose of purchasing additional narcotics from YOUNG. The CHS purchased approximately 1,950 fentanyl pills and a kilogram of methamphetamine, herein referred to as "meth", for $11,200.00 using FBI funds. Following YOUNG's instructions, the money was sent to the same BTC account provided in the previous controlled-buy (3PDZYH84zLHjkJKayohG9n7B5yCwqpjJ8p). YOUNG advised the CHS that his "brother", referring to WORKS, would be sending the fentanyl pills in the mail, and his other supplier will have a runner drop off the kilogram of meth at a location in Bogart, Georgia, located in the Middle District of Georgia.

40.    Postal Inspectors noticed the package containing the fentanyl pills was paid for at a self-service kiosk machine at the Smyrna Post Office located in 850 Windy Hill Road, SE, Smyrna, Georgia on December 11, 2023. This was the same post office used in

the previous controlled-buy on October 27, 2023. In addition, after reviewing the photograph of the mailer obtained by the kiosk, the subject appeared to be the same individual who mailed the package in the previous controlled-buy, believed to be Trace WORKS, user of Topshelfbullycamp@gmail.com.

41.    On December 30, 2023, YOUNG reached out to the CHS and advised he was having difficulties finding a runner that he trusted to drive the meth to Bogart, Georgia. Based on CHS information and as previously mentioned, YOUNG informed the CHS that the meth will be coming from a different supplier. YOUNG advised he can send the money back or send blue "fentanyl pills" instead. Agents advised the CHS to go ahead and advise YOUNG to send the fentanyl pills instead of a refund.

42.    On January 2, 2024, the CHS asked YOUNG if he is going to ship out the fentanyl pills tomorrow (January 3), which YOUNG advised yes. On January 3, 2024, Agents, and officers with the Cobb County Police Department set-up surveillance at 5106 Crescent Cove Lane, Mableton, Georgia and at the Post Office located at 850 Windy Hill Circle, Smyrna, Georgia, where WORKS had previously sent two (2) of the packages. Agents observed WORKS get into a white Honda Accord bearing Georgia license plate number SCS0784. While surveilling WORKS, Agents observed WORKS stop at a Post Office located at 3315 S Cobb Drive SE, Suite 700, Smyrna, Georgia. WORKS proceeded to walk out of the Post Office carrying what appeared to be empty boxes. WORKS then left the Post Office and stopped at 22 Peachtree Circle, Marietta, Georgia. Agents previously identified 22 Peachtree Circle as being associated with WORKS through extracted conversations previously mentioned that were located on YOUNG's

20

contraband phone. Shortly after WORKS walked inside of 22 Peachtree Circle, he was observed getting back into the Honda Accord and left the residence. After an hour or so of surveilling WORKS, Agents discontinued surveillance based on WORKS appearing to conduct several law enforcement detection maneuvers i.e., "heat checks" while driving aimlessly around Atlanta.

43.    On January 18, 2024, Postal Inspectors received one priority mail parcel bearing tracking number EI380281040US, at an undercover Post Office Box located in Jackson, Georgia, within the Middle District of Georgia. The parcel had a return address of "Kevin Gaus, 5106 Crescent Cove Ln, Mableton, GA 30126". Postal Inspectors opened the parcel, which contained approximately 42.6 grams of blue M30 pills, which tested positive for fentanyl.

44.    On March 15, 2024, Agents met with the CHS within the Middle District of Georgia for the purpose of purchasing additional narcotics from YOUNG. The CHS purchased approximately 625 fentanyl pills and a kilogram of methamphetamine, for $2,500.00 using FBI funds. Following YOUNG's instructions, the money was sent to a new BTC account (35w9dVqBVenfx4QimaDUB9wc1X3NicA48U). On March 22, 2024, Agents obtained Coinbase records pursuant to a subpoena for the BTC account. Coinbase records showed the account holder was Martesha BLY ("BLY") of 4302 Lealand Place Lane, Lawrenceville, Georgia. The account was created on March 10, 2022, and had three (3) bank accounts listed, two (2) from Navy Federal Credit Union and one (1) from Bank of America. The names on the Navy Federal accounts were Martesha BLY; however, the name on the Bank of America account included Young Cash Rentals LLC.

45.    Early in the investigation, Agents submitted a subpoena to the Department of Revenue for businesses associated with YOUNG. Agents learned that Young Cash Rentals LLC located at 1008 Augusta Drive SE, Marietta, Georgia and Marvelous & Miscellaneous 10 and Below LLC (M&M LLC) located at 4302 Lealand Place Lance, Lawrenceville, Georgia, are both associated with YOUNG, and M&M LLC is co-owned by both YOUNG and BLY. BLY is also present on YOUNG's Google records Agents received pursuant to a federal search warrant. To the date of this complaint, the CHS has not heard back from YOUNG in reference to the fentanyl pills being shipping that were purchased on March 15, 2024.

### *Identification of Chinese National Through Cryptocurrency Analysis*

46.    On December 22, 2023, Virtual Asset Service Provider ("VASP") Coinbase Inc. provided records regarding Bitcoin (BTC) address (3PDZYH84zLHjkJKayohG9n7B5yCwqpjJ8p) pursuant to a Grand Jury subpoena served on December 13, 2023. This BTC address was related to the illegal drug purchase on October 27, 2023, in which 0.187366 BTC was sent to this address. The records showed the account, created on January 15, 2021, belonged to Trace WORKS with DOB: June 29, 1999, email account tracethegoat6@gmail.com, telephone 404-435-3905, located at Address: 460 Norton Circle Southeast Smyrna, Georgia 30082 and 332 Ponce de Leon Avenue NE Atlanta, Georgia 30308.

47.    Records show the 0.187366 Bitcoin (valued at $6,298.10) from the CHS illegal drug purchase coming into the account on October 27, 2023, at 11:51 with a transaction hash of

88b265ed4f8b216a811f28a8a13d61bc92d2ce8dab5da011d49359a9dfafbd46. After these funds came into the account, on November 5, 2023, at 17:44, .18029373 Bitcoin (valued at $6,303.06) was sent to BTC address 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs with a transaction hash 5691c4c290a9abe1c3ff80621e347e5ce8cd1a5e0e28a3baea1fa880aad6965b. This address belongs to the VASP OKX, maintained by Aux Cayes FinTech Co. Ltd., d/b/a OKX, Suite 202, 2nd Floor, Eden Plaza, Eden Island, Victoria, Mahe, Seychelles.

48.     Records also showed that on December 11, 2023, at 7:45, 0.26753104 (valued at $11,182.29) came into WORKS' account and on that same date at 18:07 -0.26554076 Bitcoin (valued at $11,072.51) was sent out of the account to BTC address 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs with a Transaction Hash of f46f8f020536f8e84179edc7c4ddbb61343259e8b70471b94. This address is the same as the previous transaction and belongs to the VASP OKX. Prior to the transaction between WORKS and the VASP OKX account, Agents paid WORKS $11,200.00 for one kilogram of methamphetamine and 1,950 fentanyl pills.

49.     On February 20, 2024, an FBI letterhead records request was sent to OKX cryptocurrency exchange for records related to the account holder for the account associated with BTC address 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs and Transaction hashes 5691c4c290a9abe1c3ff80621e347e5ce8cd1a5e0e28a3baea1fa880aad6965b and f46f8f020536f8e84179edc7c4ddbb61343259e8b70471b94eeff40a215b4aa8.

50.    On February 21, 2024, OKX provided records for BTC address 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs, which revealed the account was created on March 18, 2023, by Xin WANG ("WANG"), Chinese National, with Chinese Number: 5532980768, and email cathyhope233@gmail.com and had an Account ID Number of 423131711220670715. Login IPs came back to a China ISP and a VPN with ISP Data shack with server location being Delaware, United States. Account deposits and withdrawals were all in Bitcoin (BTC) and Tether (USDT). Cryptocurrency amounts as of February 19, 2024, and valuation as of February 26, 2024, were as follows: BTC .0000000007095527 (less than 1 USD), USDT Tether 144026.36130606522783637 ($144,026.36 USD), DOT 0.00008378 (less than 1 USD), and ETH 0.000039762735183 (less than 1 USD). The address 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs has had 370 total transactions totaling $651,883.00 in total volume since first activity on March 22, 2023, to March 14, 2024. As of March 14, 2024, the crypto value of the account was $132,562.00. The cryptocurrency account balance at the time of transfer from OKX to the government controlled wallet via the Federal seizure warrant was $164,600.58.

51.    Agents also identified WANG had a total of 79 transactions sent to another BTC account (35TNjXQRs8S9xp9tCB8dscQzD1TpAcgWxt), which was the most transactions documented on the OKX records. Some of those transactions from WANG's account to BTC account (-gXxt) occurred after receiving FBI funds in relation to the controlled buys. OKX records for BTC address (-gXxt) came back to a Gao YONG ("YONG") with an email Dilyn.Pharm1@gmail.com. Based on the number of transactions

from WANG to YONG, and information detailed below, Agents believe YONG is an associate of WANG with selling illegal pharmaceutical substances in the United States.

52.     On March 18, 2024, Agents submitted a subpoena to Google for the account cathyhope233@gmail.com, associated with WANG. Subscriber records provided by Google showed WANG's telephone number +8613932951759 (Chinese Number) and a name of Li Li. IP addresses for the account associated with the IP activity also shows WANG utilizes a VPN. According to opensource database checks (Google), the telephone number ending in 1759 is associated with several websites to include, Salebaba.com and MOLbase.com. "SaleBaba.com" is a free classified website that offers a variety of things, such as pharmaceutical substances. MOLBase.com is advertised as a service platform for chemical e-commerce designed for small and medium-sized chemical-related businesses where various activities such as selling and purchasing chemicals is conducted.

53.     On the MOLbase.com listing associated with the 1759 number, under the Frequently Asked Questions portion of the pharmaceutical sales page, contact information included a Wickr username of Cathy233, which is similar to the Cathyhope233@gmail.com email address associated with WANG's OKX account. Google records for the Cathyhope233@gmail.com account also include 1-393-295-1759 as a primary telephone number, which is advertised on the listed products on both MOLBase.com and Salebaba.com. In addition, seller information via Salebaba.com listed the name of Cathy Li. Records provided by Google indicated the account holders name was "Li Li". As captured below, unique identifiers located with both the Google Records and the websites show various associations with WANG and advertisements:

*Image Capturing a Portion of Listings by Wickr: Cathy233 via SaleBaba.com*



*Image Obtained from MOLBase.com via Wickr: Cathy233*



*Additional Product Advertisements from Wickr: Cathy233 via Salebaba.com*



54.     Furthermore, after checking both telephone numbers associated with WANG, Agents identified a report filed by Western Union that indicated XIN WANG, telephone number 553-298-0768, DOB August 7, 1998, received a wire transfer of $1,500.00 from Shaunte SMALLS ("SMALLS") located in Sumter, South Carolina on September 19, 2020. The report indicated WANG, and others, were possibly involved in activity related to drug trafficking, specifically the distribution of fentanyl and precursor

chemicals. On April 5, 2024, Agents interviewed SMALLS, who advised she did not recall sending the money or what she purchased.

55.     On March 26, 2024, Agents submitted a subpoena to Google for the account dilyn.pharm1@gmail.com, associated with YONG. Subscriber records provided by Google showed YONG's telephone number + 8617736011041 (Chinese Number), backup email address of Dilyn-pharm@outlook.com and a name of Lee Dilyn. According to opensource database checks (Google), much like WANG, several websites show advertisements of controlled substances and pharmaceutical substances with Wickr me username: topchem7, WhatsApp number +85257418924, and email address of Dilyn-Pharm@outlook.com. YONG uses some of the same websites as WANG such as Salebaba.com. According to the About Me section on of the websites includes: "Please contact me in the following ways: Email: Dilynpharm@outlook.com Whatsapp: +852 57418924 Wickr: topchem7 We are a professional new chemical enterprise integrating R&D, production, and sales. The company's dominant products are pharmaceutical raw materials and intermediates, including finished products and semifinished raw materials, which support customer customization. Adhering to the spirit of strictly controlling product quality, the company welcomes customers to order samples."

*Product Advertisement from Wickr me: Topchem7 via Salebaba.com*



*Additional Product Advertisement from Wickr me: Topchem7*



56.     According to the Department of Justice Drug Enforcement Administration (DEA) Drug and Chemical Evaluation Section, chemicals as referenced in the photos above, are banned substances in the United States. According to the DEA Drug and

Chemical Evaluation Section, Eutylone, also referred to as "Bath Salt", is a synthetic cathinone with chemical structural and pharmacological similarities to schedule I and schedule II amphetamines and cathinones such as methylenedioxymethamphetamine, also referred to as MDMA. Bromazolam is commonly reported in combination with other drugs, including the opioid fentanyl. Butylone is a synthetic cathinone that is listed as a DEA Schedule I controlled substance. It is commonly used in powder form and ingested orally or by snorting. It has commonly been observed as a mixture with its homology methylone rather than as a pure substance. Ketamine is a dissociative anesthetic that has some hallucinogenic effects. It distorts perceptions of sight and sound and makes the user feel disconnected and not in control. Ketamine is controlled in schedule III of the Controlled Substances Act.

57.     On March 19, 2024, an FBI letterhead request was sent to OKX requesting a freeze on the cryptocurrency account belonging to Chinese National Xin WANG. The terms of the freeze agreed upon were that funds could come into the account but could not be sent out or withdrawn from the account, and that WANG would not be notified that law enforcement had frozen her account. OKX voluntarily agreed to freeze the account for a period of two (2) weeks. At the time of the initial freeze on March 19, 2024, the value of the account was $158,782.40 USD. OXK provided an updated account value of $161,077.63 USD on March 20, 2024, which reflected funds that were transferred from BLY's BTC address after the freeze from the FBI controlled buy on March 15, 2024. An extension of the freezing for the OKX account was requested on April 1, 2024, and OKX responded on April 2, 2024, agreeing to the extension with the new expiration date of

April 16, 2024.  On or about April 15, 2024, the FBI, seized the Defendant Property from Account No: XXXX0715 held in the name of Xin WANG at OKX Cryptocurrency Exchange, Aux Cayes FinTech Co. Ltd., Suite 202, 2nd Floor, Eden Plaza Victoria, Mahe, Seychelles, and on or about June 9, 2024, the FBI received the digital currency and stored the Defendant Property in a government controlled wallet.

*Conclusion*

58.    Based on the foregoing, there is probable cause to believe that YOUNG, WORKS and WANG engaged in drug trafficking and money laundering violations and all funds—including cryptocurrencies—stored in or accessible via the OKX wallet, identified with BTC address of 3QbjaESLwg6R3ozkzFhDFTMt8yZNbhcNDs, which was created on March 18, 2023, by Xin WANG, Chinese National, with Chinese Number: 5532980768, and Email cathyhope233@gmail.com, with Account ID Number 423131711220670715, and believed to be owned or controlled by Xin WANG, are subject to forfeiture.

59.    Based on the foregoing, probable cause exists to believe that the Defendant Property constitutes money furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, punishable by more than one year's imprisonment, constitutes proceeds traceable to such an exchange, and/or constitutes money used or intended to be used to facilitate a violation of the Controlled Substances Act, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

60.     Based on the foregoing, probable cause also exists to believe that the Defendant Property constitutes property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), or is property traceable to such property or a conspiracy to commit such a violation of Section 1956(h), and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the Defendant Property; that due notice be given to all parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendant Property forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted, this 31st day of December, 2024.

PETER D. LEARY
UNITED STATES ATTORNEY

BY:    */s/ Michael P. Morrill*
       MICHAEL PATRICK MORRILL
       Assistant United States Attorney
       Georgia Bar Number: 545410
       United States Attorney's Office
       Middle District of Georgia
       Post Office Box 1702
       Macon, Georgia 31202-1702
       Telephone: (478) 752-3511
       Facsimile: (478) 621-2655
       E-mail: Michael.Morrill@usdoj.gov